# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| NORMA BUNTON (surviving spouse) of<br>DENNIS BUNTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:12CV493 LMB |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Dennis Bunton for Disability Insurance Benefits under Title II of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 20). Defendant filed a Brief in Support of the Answer. (Doc. No. 25). Plaintiff has filed a Reply Brief. (Doc. No. 26).

## Procedural History

On January 10, 2006, plaintiff filed an application for Disability Insurance Benefits, claiming that he became unable to work due to his disabling condition on August 1, 2003. (Tr.

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

24).  This claim was denied initially and, following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated January 23, 2008.  (Tr. 681-93).

On July 31, 2010, the Appeals Council of the Social Security Administration ("SSA") granted plaintiff's request for review and remanded plaintiff's case back to an ALJ to consider new and material evidence submitted by plaintiff.  (Tr. 33-36).  On June 14, 2011, after a second hearing, plaintiff's claim was denied in a written opinion by an ALJ.  (Tr. 21-32).  Plaintiff died on June 20, 2011.  (Tr. 832).  Plaintiff's surviving spouse, Norma Bunton, was substituted as plaintiff.  (Tr. 10).  Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on January 17, 2012. (Tr. 6-9).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.  ALJ Hearing

Plaintiff's administrative hearing was held on March 1, 2011.  (Tr. 866).  Plaintiff was present and was represented by counsel.  (Tr. 20).  Also present was vocational expert Lawrence Hulett and medical expert Albert Oguejiofor.  (Tr. 866).

Plaintiff's attorney stated that plaintiff has a combination of stage 3 lung cancer,

emphysema,[2] rheumatoid arthritis,[3] coronary artery disease,[4] GERD,[5] degenerative joint[6] and disc disease[7] of his cervical spine, back problems, hypertension, depression, anxiety, bladder incontinence, chronic back pain, dizzy spells, loss of hearing, high blood pressure, elevated cholesterol, and some memory loss. (Tr. 868). Plaintiff's attorney stated that plaintiff's combination of impairments meets or equals at least one listing. (Id.). Plaintiff's attorney indicated that plaintiff's date last insured is March 31, 2008. (Id.).

Plaintiff testified that he was diagnosed with lung cancer in November of 2010, although he had a spot on his lung in 2003. (Tr. 869). Plaintiff stated that he underwent surgery in January

---

[2]A condition of the lung characterized by increase beyond the normal in the size of air spaces distal to the terminal bronchiole, with destructive changes in their walls and reduction in their number. Clinical manifestation is breathlessness on exertion. Stedman's Medical Dictionary, 631 (28th Ed. 2006).

[3]A generalized disease, occurring more often in women, which primarily affects connective tissue; arthritis is the dominant clinical manifestation, involving many joints, especially those of the hands and feet, accompanied by thickening of articular soft tissue, with extension of synovial tissue over articular cartilages, which become eroded; the course is variable but often is chronic and progressive, leading to deformities and disability. Stedman's at 160.

[4]Narrowing of the lumen of one or more of the coronary arteries; can cause congestive heart failure, angina pectoris, or myocardial infarction. Stedman's at 877.

[5]Gastroesophageal reflux disease ("GERD") is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. Stedman's at 556.

[6]Degenerative joint disease, or osteoarthritis, is arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints. Stedman's at 1388.

[7]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:201 (1993).

of 2011, during which a large portion of his lung was removed and a radiation mesh was inserted. (Id.).

The medical expert, Dr. Oguejiofor, testified that plaintiff did not meet any of the Commissioner's listings during the relevant period of between August 1, 2003 through March 31, 2008. (Tr. 869-70).

Plaintiff's attorney examined plaintiff, who testified that he was fifty-one years of age, and had been married for ten years. (Tr. 870). Plaintiff stated that he completed eleventh grade and did not obtain his GED. (Tr. 871). Plaintiff testified that he was six-feet, two-inches tall, and weighed 220 pounds. (Id.). Plaintiff stated that he had lost about twenty-eight pounds in the previous two months, although his weight was stable between 2003 and 2008. (Id.).

Plaintiff testified that he last worked at a steady job in 2003. (Id.). Plaintiff stated that he worked as a pipe fitter during the fifteen-year period prior to 2003. (Tr. 872). Plaintiff testified that he also did some plumbing and sheet metal work. (Id.).

Plaintiff testified that, during the time period between 2003 and 2008, the most serious problems preventing him from working were his back and neck impairments. (Tr. 873). Plaintiff stated that he has degenerative disc disease with chronic pain, spurs in his neck, two bulging discs crushing a disc, and torn muscles in his back form heavy lifting. (Id.). Plaintiff testified that he currently has rheumatoid arthritis, but he was not diagnosed with rheumatoid arthritis during the relevant period. (Id.).

Plaintiff testified that his back and neck pain was treated with steroid injections and

narcotic medications. (Tr. 874). Plaintiff stated that he started using a Morphine[8] pump in approximately 2009. (Id.). Plaintiff testified that he has never undergone spine surgery. (Id.). Plaintiff stated that he discussed surgery with his doctors, but they recommended that he wait so that the surgical techniques could be improved to avoid affecting his legs. (Tr. 875).

Plaintiff testified that his pain is constant and that he has been taking narcotic medications to treat his pain since prior to 2008. (Id.). Plaintiff stated that the medication did not help his pain much. (Tr. 876). Plaintiff rated the pain he experienced during the relevant period as a seven on a scale of one to ten. (Id.).

Plaintiff stated that he had been using a breathing apparatus for over one year. (Id.). Plaintiff testified that he coughed frequently, started coughing up blood, experienced shortness of breath, and experienced chest pain during the relevant period. (Tr. 876-77).

Plaintiff stated that he smoked about two packages of cigarettes a day during the relevant period. (Tr. 877). Plaintiff testified that he decreased the amount of cigarettes he smoked after he began treatment for cancer in 2009. (Tr. 878). Plaintiff stated that he smoked two cigarettes a day at the time of the hearing. (Id.).

Plaintiff testified that he has heart problems, including angina[9] and arrhythmia.[10] (Id.).

---

[8]Morphine is an opioid analgesic indicated for the treatment of moderate to severe pain requiring continuous, around-the-clock opioid therapy for an extended period of time. See Physician's Desk Reference (PDR), 1773 (63rd Ed. 2009).

[9]A severe, often constricting pain or sensation of pressure. Stedman's at 85.

[10]Loss or abnormality of rhythm. Stedman's at 137.

Plaintiff stated that he underwent three catheterizations.[11] (Id.). Plaintiff testified that his most recent catheterization was normal, but during the first one he had scar tissue removed from his arteries. (Id.). Plaintiff stated that the first catheterization occurred during the relevant period. (Id.).

Plaintiff testified that he experiences anxiety due to his heart conditions because he fears having a heart attack. (Tr. 879). Plaintiff stated that his heart races when he experiences anxiety. (Id.). Plaintiff testified that he experienced these symptoms during the relevant period, and that he took Valium[12] to treat the symptoms. (Id.).

Plaintiff stated that he underwent angioplasty[13] after the first catheterization. (Tr. 880).

Plaintiff testified that he experienced lightheadedness from hypertension during the relevant period. (Id.). Plaintiff stated that he also experienced gastro reflux problems, including heartburn and constipation, for which he took medication. (Tr. 881).

Plaintiff testified that he experienced depression in addition to anxiety during the relevant period. (Tr. 882). Plaintiff stated that he became depressed due to his father's death six years prior to the hearing, as well as his inability to work. (Id.).

Plaintiff testified that he tried to avoid being in public due to his anxiety. (Tr. 883).

---

[11]Passage of a catheter into the heart through a vein or artery to withdraw samples of blood, measure pressures within the heart's chamber or great vessels, and inject contrast media; used mainly for diagnostic purposes. Stedman's at 327.

[12]Valium is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety. It is also indicated for the relief of skeletal muscle spasm. See PDR at 2659.

[13]Reconstitution or recanalization of a blood vessel; may involve balloon dilation, mechanical stripping of intima, or placement of a stent. Stedman's at 88.

Plaintiff stated that he was fifty percent deaf in both ears. (<u>Id.</u>). Plaintiff testified that he had difficulty hearing in loud environments, including industrial settings. (<u>Id.</u>).

Plaintiff stated that he spent his days sitting in his recliner and reading the Bible. (Tr. 884). Plaintiff testified that he went to bed around midnight and got up around noon, depending on when his doctor appointments were scheduled. (<u>Id.</u>). Plaintiff stated that he got up frequently during the night to use the restroom. (<u>Id.</u>). Plaintiff testified that he took naps during the day. (<u>Id.</u>).

Plaintiff stated that, during the relevant period, he took nearly thirty medications. (Tr. 885).

Plaintiff testified that his wife helped him get in and out of the shower and bathe so he would not fall. (Tr. 886).

Plaintiff stated that he also experienced recurring shingles, chemical dermatitis, recurring urinary tract infections, sinusitis, and poor vision during the relevant period. (Tr. 887-88).

The ALJ examined plaintiff, who testified that he was able to drive during the relevant period, although he usually only drove locally. (Tr. 889). Plaintiff stated that he occasionally hunted and fished during the relevant period, and mowed the yard with a riding mower. (<u>Id.</u>).

Plaintiff testified that he was able to lift approximately twenty-five pounds, during the relevant period. (Tr. 890). Plaintiff stated that he was able to walk one mile easily in the early stages, but toward the end of the period he was able to walk shorter distances and had to stop frequently to catch his breath. (<u>Id.</u>). Plaintiff testified that he was able to walk one hundred yards at the end of 2008. (<u>Id.</u>). Plaintiff stated that he had difficulty sitting for long periods because he would experience muscle spasms in his back. (Tr. 891).

Plaintiff's attorney re-examined plaintiff, who testified that he was unable to lift twenty-five pounds on a regular basis during the relevant period. (Id.). Plaintiff stated that he had to stop frequently to catch his breath when walking 100 yards. (Tr. 892). Plaintiff testified that he walked this distance when hunting, and that he tried to stay on top of the ridge where the ground was flat. (Id.). Plaintiff stated that he was able to walk continuously on flat ground for about five minutes before he would have to stop and rest during the relevant period. (Tr. 893). Plaintiff testified that he used inhalers about three times a day during the relevant period. (Id.).

Plaintiff's attorney next examined plaintiff's wife, Norma Bunton, who testified that she had been married to plaintiff for about ten years and had been with plaintiff for about twenty-five years. (Tr. 894). Mrs. Bunton stated that during the period of 2003 through 2008, plaintiff was unable to bend down, and occasionally had to lie down or sit in a recliner due to back pain. (Tr. 894). Mrs. Bunton stated that plaintiff was unable to take out the trash during the relevant period. (Tr. 895).

Mrs. Bunton testified that plaintiff's hunting and fishing practices changed during the relevant period. (Id.). Mrs. Bunton stated that, prior to 2003, plaintiff went hunting all day, but after 2003, he hunted for half of a day and then had to lie down for a day due to pain. (Tr. 896). Mrs. Bunton testified that plaintiff would camp for two-week periods while he hunted prior to 2003. (Id.).

Mrs. Bunton stated that plaintiff tried to mow with a riding mower during the relevant period, but he experienced difficulties because the bouncing and sitting hurt his back. (Tr. 897). Mrs. Bunton testified that plaintiff was only able to mow for ten to fifteen minutes before he experienced back pain. (Id.).

Mrs. Bunton stated that plaintiff had a dog during the relevant period. (Id.). Mrs. Bunton testified that, prior to 2003, plaintiff took care of the dog, took the dog for walks, wrestled with the dog, and was around the dog daily for three to five hours. (Tr. 898). Mrs. Bunton stated that during the relevant period, plaintiff only petted the dog on its head, and had contact with the dog for ten minutes at a time one to two times a week. (Id.).

Mrs. Bunton testified that plaintiff's most serious problems during the relevant period were his back and his neck. (Id.). Mrs. Bunton stated that plaintiff always complained about joint pain, shoulder pain, hip pain, knee pain, and back pain. (Id.). Mrs. Bunton testified that plaintiff also had difficulty breathing, and would run out of breath easily. (Tr. 899).

Mrs. Bunton stated that she noticed a decline in plaintiff's hearing during the relevant period. (Id.). Mrs. Bunton testified that plaintiff was unable to hear the game when he hunted, and he had difficulty hearing when talking on the phone. (Id.).

The ALJ next examined the medical expert, Dr. Oguejiofor. (Tr. 900). The ALJ asked Dr. Oguejiofor to identify plaintiff's medically determinable impairments during the relevant period. (Id.). Dr. Oguejiofor testified that plaintiff's first problem relates to his muscular skeletal system. (Id.). Dr. Oguejiofor stated that an MRI revealed evidence of spondylosis[14] or degenerative disease of the cervical spine with no evidence of myelopathy,[15] which indicates that there was no evidence of compression of the spinal cord leading to neurological deficits. (Id.).

Dr. Oguejiofor stated that plaintiff's second problem is chest pain. (Id.). Dr. Oguejiofor testified that plaintiff was evaluated for chest pain in November 2006, which was essentially

---

[14]A general term for any lesion of the spine of a degenerative nature. Stedman's at 1813.

[15]Disorder of the spinal cord. Stedman's at 1270.

negative. (Id.). Dr. Oguejiofor testified that plaintiff underwent a cardiac catheterization in August of 2006, which revealed no evidence of coronary artery disease. (Tr. 901). Dr. Oguejiofor stated that plaintiff's echocardiogram was normal, with an ejection fraction of 55 to 60 percent. (Id.). Dr. Oguejiofor explained that a normal ejection fraction was anything above forty percent. (Id.).

Dr. Oguejiofor testified that plaintiff also underwent a CT scan of his chest in 2006, which revealed evidence of emphysema due to his years of smoking. (Id.). Dr. Oguejiofor stated that plaintiff underwent two pulmonary function studies, which revealed evidence of airway obstruction, but not rising to listing severity. (Id.).

Finally, Dr. Oguejiofor testified that plaintiff was evaluated for hearing problems and was found to have hearing loss due to a prolonged period of working in a noisy environment. (Id.). Dr. Oguejiofor stated that plaintiff's hearing loss was not of listing severity. (Id.).

Dr. Oguejiofor expressed the opinion that, considering plaintiff's impairments in combination during the relevant period, plaintiff would have been able to function at a light level. (Tr. 902).

The ALJ next examined vocational expert Lawrence Hulett, who testified that plaintiff's past work is classified as pipe fitter, which is heavy and skilled; plumber, which is heavy and skilled; and installer, which is medium and semiskilled. (Tr. 903).

The ALJ asked Mr. Hulett to assume a hypothetical individual with plaintiff's background and the following limitations: able to occasionally lift and carry ten pounds; frequently lift and carry five pounds; stand or walk two hours out of an eight-hour work day; sit for six hours out of an eight-hour work day; occasionally climb ramps and stairs; never climb ladders, ropes or

- 10 -

scaffolds; occasionally balance and stoop; never kneel; occasionally crouch; never crawl; must

avoid working around unprotected heights, open flames, dangers, and moving machinery; avoid

concentrated exposure to dust, fumes, gases, poor ventilation, and loud noises; can hear within

ten feet; can understand, remember and carry out short and simple instructions; can maintain

attention and concentration for extended periods on simple tasks; limited to superficial contact

with the general public; occasional contact with co-workers and occasionally contact with

supervisors. (Tr. 903-04). Mr. Hulett testified that the individual would be unable to perform

plaintiff's past work. (Tr. 904). Mr. Hulett stated that the individual could perform other

sedentary and unskilled positions, such as: sorter (35,000 positions nationally, 250 positions

locally); optical goods worker (135,000 positions nationally, 300 positions locally); and water

clerk (185,000 positions nationally, 400 jobs locally). (Tr. 904-05).

The ALJ next asked Mr. Hulett to assume the same hypothetical, except the individual

were limited to standing and walking no more than one hour out of an eight-hour work day and

sitting no more than four hours out of an eight-hour workday. (Tr. 905). Mr. Hulett testified that

the individual would be unable to perform any jobs with these limitations. (Id.).

## B.     Relevant Medical Records

On August 23, 2002, J. Todd Douglas, M.D. diagnosed plaintiff with coronary artery

disease ("CAD"), increased lipids, and GERD. (Tr. 198). Plaintiff saw Dr. Douglas regularly for

follow-up through November 2005, and frequently complained of anxiety. (Tr. 194). Dr.

Douglas prescribed Valium. (Id.).

Plaintiff presented to cardiologist Tracy Q. Callister, M.D. on October 21, 2002, with

complaints of chest pain. (Tr. 226). Dr. Callister stated that plaintiff had known CAD. (Id.). Dr.

Callister diagnosed plaintiff with mild, stable CAD; mild COPD,[16] still smoking; elevated lipids; and atypical chest pains, which were improving with GERD therapy. (Id.). Plaintiff continued to complain of chest pains on November 8, 2002. (Tr. 224). Dr. Callister noted that plaintiff's August 2002 catheterization revealed a normal left ventricle, with an ejection fraction of sixty percent. (Id.). Dr. Callister diagnosed plaintiff with recurrent, atypical chest pains; smoker with mild CAD; elevated lipids; and COPD. (Id.). Dr. Callister advised plaintiff to quit smoking. (Id.).

Plaintiff saw Dr. Callister on February 4, 2004, for follow-up after a visit to the ER for chest pain and dizziness. (Tr. 218). Dr. Callister diagnosed plaintiff with hypertension, atypical chest pain, and elevated lipids. (Id.). He prescribed medication for plaintiff's hypertension. (Id.). On March 1, 2004, plaintiff complained of extreme fatigue with any exertion and back pain. (Tr. 216). On March 30, 2004, plaintiff continued to complain of fatigue and also reported occasional numbness in his arms and legs. (Tr. 214). Dr. Callister noted that plaintiff had been cleared to return to work from a cardiac standpoint but plaintiff reported that he "gets too tired." (Id.). Dr. Callister recommended that plaintiff see his primary care physician for further testing. (Id.).

Plaintiff saw neurologist Helion W. Cruz, M.D. on September 21, 2004, with complaints of neck pain and numbness in his arms. (Tr. 130). Plaintiff also complained of chest pain and dizziness. (Id.). Dr. Cruz ordered an MRI of the cervical spine. (Tr. 127). Plaintiff underwent an MRI of the cervical spine on October 5, 2004, which revealed C5-6 and C6-7 degenerative

---

[16]Chronic obstructive pulmonary disease ("COPD") is a general term used for those diseases with permanent or temporary narrowing of small bronchi, in which forced expiratory flow is slowed, especially when no etiologic or other more specific term can be applied. Stedman's at 554.

disc disease changes; hard disc formation resulting in moderate central and bilateral foraminal stenosis[17] at C5-6; and hard disc formation at C6-7 with right and neural foraminal stenosis and central/right paracentral disc protrusion.  (Id.)

Plaintiff saw Dr. Callister for follow-up on October 28, 2004, at which time plaintiff reported that he had stopped smoking.  (Tr. 235).  Dr. Callister's impression was: mild CAD with slow flow secondary to tobacco use; lipids; controlled hypertension; and mild lung disease.  (Id.).

Plaintiff saw Dr. Cruz for follow-up in October 2004, November 2004, January 2005, and February 2005, at which time he continued to complain of dizziness, neck pain, and chest pain. (Tr. 135-39).

On February 22, 2005, plaintiff presented to Peter B. Kroll, M.D. at Cumberland Pain Associates for a consultation regarding evaluation and treatment of chronic cervical pain.  (Tr. 288).  Plaintiff reported a fifteen-year history of neck pain with no known injury or cause.  (Id.). Plaintiff also reported paresthesias in the arms and hands bilaterally.  (Id.).  Plaintiff rated his pain as a four on a scale of one to ten on average, with his worst pain an eight.  (Id.).  Plaintiff reported that physical therapy did not help his pain.  (Id.).  Upon physical examination, Dr. Kroll noted that plaintiff had full motor strength in all muscle groups of the upper and lower extremities, diffuse tenderness of the cervical spine that radiates into the trapezial regions bilaterally, and limited range of motion of the cervical spine. (Tr. 288-89).  Plaintiff's problems

---

[17]Narrowing of the neural foramen, which is the opening between the neural arches of adjacent vertebral bones that allows the spinal nerves to emerge from the spinal canal.  See Stedman's at 1832; Medical Information Systems for Lawyers, § 6:201.

were listed as cervical radiculopathy,[18] cervicalgia,[19] and degeneration of cervical intervertebral disc. (Id.). Dr. Kroll recommended a series of cervical epidural steroid injections. (Id.).

Dr. Kroll administered cervical epidural steroid injections on March 5, 2005, March 9, 2005, and March 16, 2005. (Tr. 290-92). On March 22, 2005, plaintiff reported that his pain was much better after the steroid injections. (Tr. 286).

Plaintiff saw Dr. Cruz for follow-up on April 15, 2005, at which time he reported that the injections Dr. Kroll gave him helped somewhat. (Tr. 140). On May 27, 2005 plaintiff reported increased neck and mid-back pain. (Tr. 141).

Plaintiff saw Dr. Douglas on May 27, 2005, at which time it was noted that plaintiff had seen a neurologist regarding neck pain and was being referred to a neurosurgeon. (Tr. 173). Plaintiff was "doing OK" otherwise, and his anxiety was stable on medication. (Id.).

Plaintiff saw Dr. Kroll on June 1, 2005, at which time he rated his pain a seven on average. (Tr. 282). Plaintiff reported that Morphine caused poor pain coverage with marked cognitive side effects. (Id.). Dr. Kroll discussed possible surgical evaluation, but plaintiff indicated that he wanted to continue with conservative medication management. (Id.). Plaintiff indicated that he would try Oxycontin.[20] (Id.).

In a letter to plaintiff's attorney dated June 29, 2005, Dr. Cruz stated that plaintiff presented in September 2004 with symptoms suggestive of radiculopathy and was found to have

---

[18]Disorder of the spinal nerve roots. Stedman's at 1622.

[19]Neck pain. See Stedman's at 351.

[20]Oxycontin is an opioid analgesic indicated for the management of moderate to severe pain when a continuous, around-the-clock analgesic is needed for an extended period of time. See PDR at 2590.

by MRI some central stenosis with flattening of the spinal cord at C5/6 and C6/7, with probable

root impingement at these levels.  (Tr. 143).  Dr. Cruz indicated that plaintiff underwent

EMG/nerve conduction studies, which revealed isolated myotonic[21] discharge in the right triceps

without other evidence of radiculopathy.  (Id.).  Dr. Cruz stated that plaintiff had been unable to

resume employment due to persistence of symptoms including neck pain left sided chest pain,

numbness in the arms and feet, and weakness of the arms.  (Id.).  Dr. Cruz stated that plaintiff felt

that he was unable to return to work due to persistent pain and limitations in mobility due to his

pain.  (Id.).  Dr. Cruz indicated that a functional capacity evaluation may be obtained in the future

to document any limitations.  (Tr. 142).

Plaintiff saw Dr. Kroll for follow-up on July 7, 2005, at which time he reported that he

was satisfied with how his medication was working and denied side effects.  (Tr. 280).  Plaintiff

was continued on his medications.  (Tr. 281).

Plaintiff saw Dr. Douglas on August 1, 2005, at which time it was noted that plaintiff had

had "a tough time" following his father's death.  (Tr. 171).  Plaintiff's anxiety had increased, and

he was taking extra Valium.  (Id.).

Plaintiff saw Dr. Kroll on August 2, 2005, at which time he reported his current

medication regimen was working well to manage his pain and that he wished to continue it.  (Tr.

278).  Plaintiff was performing his activities of daily living independently.  (Id.).  Dr. Kroll

indicated that a June 2005 lumbar MRI ordered by Cruz revealed disc dessication[22] and a disc

---

[21]Delayed relaxation of a muscle after a strong contraction due to abnormality of the
muscle membrane, specially the ion channels.  Stedman's at 1276.

[22]Dehydration.  Stedman's at 522.

bulge at L4-5. (Tr. 279). Dr. Kroll continued plaintiff's Oxycontin. (Id.). On August 30, 2005,

plaintiff continued to report that his medication regimen was working well to manage his pain.

(Tr. 276). Dr. Kroll noted that plaintiff had seen a neurosurgeon, Dr. Hubbard, who did not

recommend surgery. (Id.). Dr. Kroll indicated that plaintiff had a good response to the last series

of cervical epidural steroid injections, and recommended another series of injections. (Id.).

Plaintiff saw Michael Kennedy, PT, on August 30, 2005, for an initial evaluation regarding

a diagnosis of cervical pain. (Tr. 167). Plaintiff reported a long-standing history of cervical

discomfort. (Id.). Upon examination, Mr. Kennedy noted decreased range of motion in the

cervical area and decreased strength in the cervioscapular and upper extremity musculature. (Id.).


Plaintiff saw Dr. Kroll on October 25, 2005. (Tr. 273). Dr. Kroll indicated that plaintiff

had a good response to cervical epidural steroid injections he underwent in September 2005.

(Id.). Plaintiff complained of chest and mid-back pain. (Id.). Plaintiff also reported shortness of

breath, dizziness, and nausea. (Id.). Dr. Kroll increased plaintiff's Oxycontin and escorted

plaintiff to the emergency room for treatment of his acute chest pain. (Tr. 274).

Plaintiff saw Dr. Douglas on November 1, 2005, at which time he reported that he was

feeling okay and had no chest pain, although he had been hospitalized for two days for

tachycardia.[23] (Tr. 169).

In a letter to Dr. Douglas dated November 10, 2005, Douglas Thomson, M.D. stated that

he had seen plaintiff on November 10, 2005, for complaints of posterior chest pain. (Tr. 310).

Plaintiff had a history of asbestos exposure. (Id.). Dr. Thomson stated that he would obtain a CT

_____

[23]Rapid beating of the heart. Stedman's at 1931.

of the chest and a bronchoscopy due a report of hemoptysis.[24]  (Id.).  In a letter dated December

2, 2005, Dr. Thompson stated that plaintiff had undergone a bronchoscopy, which was essentially

negative.  (Tr. 305).  Dr. Thompson indicated that a CT of plaintiff's chest revealed some pleural

thickening with some fibrosis, possibly some bronchiectasis[25] and some emphysema.  (Id.).

Plaintiff's pulmonary function testing showed a mixed pattern with an FEV-1[26] of 2.78 (68

percent of predicted).  (Id.).  Dr. Thompson stated that he felt plaintiff had some asbestosis,[27]

some COPD with bronchiectasis, and experienced an episode of hemoptysis.  (Id.).  Dr.

Thompson indicated that he strongly advised plaintiff to stop smoking.  (Id.).

On August 23, 2006, plaintiff presented to the emergency room at Phelps County

Regional Medical Center with reports of chest pains.  (Tr. 350-64).  Plaintiff was transferred to

Barnes-Jewish Hospital.  (Id.).

Plaintiff was admitted at Barnes-Jewish Hospital from August 24, 2006 through August

27, 2006.  (Tr. 403).  Plaintiff underwent a CT scan of the chest on August 24, 2006, to evaluate

for possible aortic dissection.[28]  (Tr. 460).  The CT scan revealed no aortic dissection, but noted

---

[24]Spitting of blood derived from the lungs or bronchial tubes as a result of pulmonary or bronchial hemorrhage.  Stedman's at 872.

[25]Chronic dilation of bronchi or bronchioles as a sequel of inflammatory disease or obstruction often associated with heavy sputum production.  Stedman's at 269.

[26]Forced expiratory volume 1 ("FEV1") is the maximal volume that can be expired in one second when starting from maximal inspiration.  In obstructive lung disease, the FEV1 is usually decreased.  A normal FEV1 is eighty percent and above.  See Stedman's at 2140.

[27]Lung disease resulting from inhalation of asbestos fibers suspended in ambient air.  See Stedman's at 164.

[28]A pathologic process, characterized by splitting of the media layer of the aorta, which leads to formation of a dissecting aneurysm.  Stedman's at 572.

emphysematous changes within the lungs with biapical subpleural blebs,[29] multiple prominent

mediastinal lymph nodes,[30] and sigmoid diverticulosis[31] without evidence of active diverticulitis.[32]

(Tr. 461). Plaintiff underwent a cardiac catheterization on August 25, 2006, which revealed no

significant coronary artery disease. (Tr. 404).

Plaintiff started receiving treatment approximately monthly at Community Care Clinic for

his various complaints on September 12, 2006. (Tr. 555-63). Plaintiff was diagnosed with CAD,

cervicalgia, depression, and anxiety. (Id.). Plaintiff was prescribed medication for his complaints,

and was referred to a pain management physician. (Id.).

Plaintiff presented to the emergency room at Phelps County Regional Medical Center on

November 3, 2006, with complaints of chest pain. (Tr. 488-92). Plaintiff also complained of

chronic cervical pain. (Id.). No evidence of ischemia was found, and he had a good exercise

tolerance. (Tr. 491). Plaintiff underwent an MRI of the cervical spine, which revealed

degenerative disc disease at C5-6 and C6-7 with central disc bulging at both of these levels

impinging upon the thecal sac, with no evidence of spinal stenosis or nerve root impingement at

any level. (Tr. 508). It was noted that plaintiff's cervicalgia seemed out of proportion to his

---

[29]An air-filled lung cyst within or contiguous to the visceral pleura. Stedman's at 228.

[30]Lymph nodes located in the part of the chest cavity between the heart and lungs. See Stedman's at 1129.

[31]Presence of a number of diverticula, or pouches, in the wall of the colon. See Stedman's at 575.

[32]Inflammation of a diverticulum. Stedman's at 575.

current MRI findings.  (Tr. 491).  Plaintiff improved with the addition of Cymbalta[33] for management of uncontrolled depression and anxiety.  (Id.).  It was noted that, while plaintiff reported "horrible lung disease," testing revealed mild COPD and emphysema, which could be explained by his extensive tobacco use history.  (Id.).  Plaintiff's medications were adjusted, and he was discharged on November 8, 2006.  (Id.).

Plaintiff presented to the emergency room at Phelps County Regional Medical Center on March 18, 2007, with complaints of coughing up blood.  (Tr. 633-47).  Plaintiff underwent a CT scan of the chest, which was normal.  (Id.).

Plaintiff presented to the emergency room at Missouri Baptist Hospital on July 19, 2007, with complaints of increased back pain, bilateral leg pain, and left forearm pain after being hit by a car.  (Tr. 675).  Plaintiff was treated and released that day.  (Id.).

Plaintiff started treatment with Glenn Kunkel, M.D., and Kevin E. Snyders, FNP, for pain management in March 2007.  Plaintiff underwent an MRI of the cervical spine, ordered by Dr. Kunkel, on March 4, 2007, which revealed spondylosis with degenerative disc disease at C5-6 and C6-7.  (Tr. 651).  An MRI of the lumbar spine revealed spondylosis with degenerative facet changes at L3-4 through L5-S1.  (Tr. 654).  An MRI of the thoracic spine was negative.  (Tr. 653).  Mr. Snyders administered a nerve root block at C5-6 and C6-7 on March 7, 2007.  (Tr. 648).  Mr. Snyders administered bilateral cervical facet injections at C4-5, C5-6, and C6-7 on March 20, 2007.  (Tr. 626).  Mr. Snyders performed radiofrequency thermocoagulation[34] of the

---

[33]Cymbalta is indicated for the treatment of major depressive disorder, generalized anxiety disorder, and fibromyalgia.  See PDR at 1801.

[34]Radiofrequency current is used to heat nerve tissue, thereby interrupting pain signals from that particular area.  See Stedman's at 1977.

left side at C3-4, C4-5, and C5-6 on April 3, 2007.  (Tr. 621).

Mr. Snyders completed a Physical Residual Functional Capacity Assessment Form on April 3, 2007, in which he expressed the opinion that plaintiff could sit for two hours in an eight-hour workday; stand for one hour in an eight-hour workday; walk for one hour in an eight-hour workday; and work for one hour in an eight-hour workday.  (Tr. 657).  In support of these findings, Mr. Snyders noted plaintiff's degenerative disc disease of the cervical and lumbar spine, and chronic pain.  (Id.).  Mr. Snyders found that plaintiff could occasionally lift up to ten pounds, and noted plaintiff's cervical spondylosis, degenerative disc disease, and chronic pain.  (Id.).  Mr. Snyders indicated that plaintiff could not use his hands for repetitive action due to numbness in his hands, and was unable to use his feet for repetitive movements due to degenerative disc disease of the lumbar spine and chronic pain.  (Tr. 658).  Mr. Snyder found that plaintiff could occasionally bend, squat, crawl, stoop, crouch, and kneel; and could never climb or reach above due to vertigo, osteoarthritis, anxiety, panic attacks, and CAD.  (Tr. 659).   Mr. Snyder indicated that plaintiff could occasionally be around moving machinery, be exposed to marked temperature changes, and drive automotive equipment; and could never be exposed to unprotected heights, be exposed to dust or fumes, or be exposed to noise.  (Id.).  As support for this finding, Mr. Snyders noted plaintiff's vertigo, anxiety, panic attacks, emphysema, and history of asbestos exposure. (Id.).  Mr. Snyders described plaintiff's pain as "slight," which indicates it "could be tolerated but would cause some handicap in the performance of the activity precipitating the pain."  (Id.).  Mr. Snyders noted that plaintiff's degenerative disc disease caused his pain.  (Tr. 660).  Mr. Snyders noted that plaintiff's pain was mild.  (Id.).  He indicated that muscle spasms were present and were an objective indicator of pain.  (Id.).  When asked whether there were specific medical

reasons plaintiff should not work, Mr. Snyders stated that this was up to plaintiff's primary physician.  (Tr. 661).

On May 10, 2007, Mr. Snyders administered facet injections at T6-7, T7-8, and T8-9. (Tr. 776).  Mr. Snyders and Dr. Kunkel administered more series of injections and radio-frequency lesioning at the cervical and lumbar spine through December 2007.  (Tr. 747-73).

Plaintiff presented to rheumatologist Sanjay Ghosh, Ph.D., M.D., on October 16, 2007, upon the referral of Dr. Kunkel.  (Tr. 802).  Plaintiff complained of constant moderate dull pain in the knees, hips, neck, mid back, and low back, which was increased by exertion and decreased by his medications to some extent.  (Tr. 802).  Upon examination, plaintiff's lungs were clear; he had a regular heart rate and rhythm; tenderness was noted in the cervical, thoracic, and lumbar spine without muscle spasm; his gait and station were normal; tenderness was noted with trace swelling in the elbows, shoulders, knees, and ankles bilaterally with normal range of motion; tenderness was noted in the hips bilaterally; plaintiff had normal muscle strength and tone; and his mood and affect were normal.  (Id.).  Dr. Ghosh diagnosed plaintiff with inflammatory arthritis, neck pain, and low back pain.  (Id.).  Dr. Ghosh continued plaintiff's Oxycontin, started him on Plaquenil,[35] and ordered lab work.  (Id.).

Plaintiff underwent an MRI of the cervical spine on November 15, 2007, which revealed degenerative disc disease resulting in moderate spinal canal stenosis at C5-C6 and mild spinal canal stenosis at C6-C7; and mild right-sided neural foraminal narrowing at C5-C6 and C6-C7. (Tr. 792).

---

[35]Plaquenil is indicated for the treatment of autoimmune diseases, including rheumatoid arthritis.  See WebMD, http://www.webmd.com/drugs (last visited September 9, 2013).

On December 7, 2007, Dr. Ghosh noted tenderness without swelling in the shoulders, right knee hips, elbows, and wrists with normal range of motion; normal muscle strength and tone; and a normal gait and station.  (Tr. 801).  Dr. Ghosh diagnosed plaintiff with ankylosing spondylitis.[36]  (Id.).  Dr. Ghosh indicated that plaintiff's lumbar spine x-rays revealed only mild right sacroillitis.[37]  (Id.).  Plaintiff's medications were adjusted.  (Id.).

On December 10, 2007, Dr. Kunkel stated that plaintiff may have a component of fibromyalgia[38] or some underlying rheumatologic disorder (Tr. 748).  Dr. Kunkel noted that plaintiff had been diagnosed by Dr. Ghosh with spondylitis as well as possible rheumatoid arthritis.  (Id.).  Dr. Kunkel also indicated that testing revealed increased scores for somatization, anxiety, and depression.  (Id.).

On January 4, 2008, plaintiff complained of constant moderate dull pain in the neck and low back and morning stiffness lasting two hours.  (Tr. 799).  Dr. Ghosh noted tenderness in the cervical and lumbar spine without muscle spasm; nontender thoracic spine; normal gait and station; and tenderness with trace swelling in the wrist, ankles, shoulders, and knees.  (Tr. 799).  Dr. Ghosh diagnosed plaintiff with rheumatoid arthritis, and adjusted his medications.  (Id.).

On March 18, 2008, plaintiff complained of constant dull pain in the hands, knees, and shoulders; low back and neck pain; and morning stiffness lasting one hour.  (Tr. 801).  Dr. Ghosh

[36]Arthritis of the spine, resembling rheumatoid arthritis, which may progress to bony ankylosis with ossification of the anterior and posterior longitudinal ligaments.  Stedman's at 1813.

[37]Inflammation of the sacroiliac joint.  Stedman's at 1714.

[38]A common syndrome of chronic widespread soft-tissue pain accompanied by weakness, fatigue, and sleep disturbances; the cause is unknown.  Stedman's at 725.

noted tenderness in the cervical and lumbar spine without muscle spasm; nontender thoracic spine; normal gait and station; and tenderness with trace swelling in the wrists, elbows, hips, and shoulders. (Id.). Dr. Ghosh diagnosed plaintiff with rheumatoid arthritis. (Id.). He continued plaintiff's medications and started him on Orencia infusions.[39] (Id.).

On April 2, 2008, April 30, 2008, and May 29, 2008, Dr. Ghosh indicated that plaintiff's rheumatoid arthritis was doing "better," and continued his medication and Orencia infusion. (Tr. 799, 800).

On December 19, 2008, Dr. Ghosh completed an Arthritis Residual Functional Capacity Questionnaire, in which he indicated that he was treating plaintiff for rheumatoid arthritis, neck, pain and low back pain. (Tr. 820). Dr. Ghosh noted that the following objective signs were present: joint warmth, reduced grip strength, sensory changes, swelling, muscle spasm, abnormal gait, and impaired sleep. (Id.). Dr. Ghosh expressed the following opinions: plaintiff's experience of pain was severe enough to interfere with attention and concentration constantly; his depression and anxiety affected his pain; he was incapable of even "low stress jobs;" he was able to walk one city block without resting; he was able to sit for thirty minutes at one time; he was able to stand for ten minutes at one time; he was able to sit, stand, and walk less than two hours total in an eight-hour work day; he needs periods of walking every ten minutes for two minutes during an eight hour day; he needs a job which permits shifting positions at will from sitting, standing, or walking; he needs to take unscheduled breaks every hour for fifteen minutes during an eight-hour work day; he must use a cane or other assistive device while engaging in occasional standing or

_____

[39]Orencia infusions are indicated for the treatment of patients with moderately to severely active rheumatoid arthritis. See PDR at 921.

walking; he can never lift even less than ten pounds; he can never twist, stoop, crouch, or climb

ladders or stairs; he has significant limitations in doing repetitive reaching, handling, or fingering;

he would likely be absent from work as a result of his impairments or treatments more than four

days a month; and he has fifty percent hearing loss. (Tr. 820-25).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act
      on March 31, 2008.

2.    The claimant did not engage in substantial gainful activity during the period from
      his alleged onset date of August 1, 2003 through his date last insured of March 31,
      2008 (20 CFR. 404.1571 et seq.).

3.    Through the date last insured, the claimant had the following severe impairments:
      degenerative disc disease and degenerative joint disease of the cervical spine, mild
      obstructive pulmonary disease, lumbar spondylosis, coronary heart disease and
      hypertension (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or
      combination of impairments that met or medically equaled one of the listed
      impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
      404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that,
      through the date last insured, the claimant had the residual functional capacity to
      perform sedentary work as defined in 20 CFR 404.1567(a) except he was limited
      to lifting and/or carrying 10 pounds occasionally and 5 pounds frequently, stand
      and walk 2 hours in an 8-hour workday (with normal breaks) and sit 6 hours in an
      8-hour workday (with normal breaks). He could occasionally climb ramps and
      stairs, but never ladders, scaffolds or ropes. He could occasionally balance, stoop,
      and crouch but never kneel or crawl. He should have avoided working in
      environments with concentrated exposure to loud noises. He should have avoided
      concentrated exposure to dusts, fumes, gases, and poor ventilation. He should
      have avoided work around unprotected heights, open flames, or dangerous and/or
      moving machinery. He was able to understand, remember, and carry out simple
      instructions and maintain attention and concentration for extended periods on
      simple instructions. He was limited to superficial contact with the public and

occasional contact with co-workers and supervisors.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on May 19, 1959 and was 48 years old, which is defined as a younger individual age 45-49, on the date last insured (20 CFR 404.1563).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 1, 2003, the alleged onset date, through March 31, 2008, the date last insured (20 CFR 404.1520(g)).

(Tr. 26-32).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits filed on January 10, 2006, the claimant was not disabled under sections 216(I) and 223(d) of the Social Security Act through March 31, 2008, the last date insured.

(Tr. 32).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.**     **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. <u>See</u> 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." <u>Id.</u> Age, education and work experience of a claimant are not considered in making the "severity" determination. <u>See</u> <u>id.</u>

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. <u>See</u> <u>id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. <u>See</u> <u>id.</u> Throughout this process, the burden remains

upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  See id.  Next, the Commissioner must determine the severity of the impairment based on those ratings.  See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  See id.  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

C.    **Plaintiff's Claims**

Plaintiff first argues that the ALJ erred in failing to consider the combined effect of all of plaintiff's impairments in determining whether his impairments were disabling.  Plaintiff next argues that the ALJ erred in disregarding plaintiff's diagnoses of lung cancer and rheumatoid arthritis on the basis that they were made after plaintiff's date last insured.  Plaintiff also contends that the ALJ erred in assessing the credibility of plaintiff's subjective complaints.  Plaintiff next argues that the ALJ erred in failing to accord controlling weight to the opinion of plaintiff's treating physician Dr. Ghosh.  Plaintiff finally argues that the ALJ erred in finding that plaintiff was capable of performing other work.  The undersigned will first discuss the ALJ's treatment of plaintiff's diagnoses of lung cancer and rheumatoid arthritis, as this issue affects the remainder of plaintiff's claims.

Plaintiff argues that the ALJ erred in failing to consider plaintiff's lung cancer and rheumatoid arthritis as severe impairments prior to the expiration of his insured status.  Plaintiff's date of last insured is March 31, 2008.  His onset date of disability is August 1, 2003.  To be entitled to benefits, he must prove that he was disabled before his insurance expired on March 31, 2008.  Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (citing Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998)).  "A non-disabling condition which later develops into a disabling condition after the expiration of a claimant's insured status cannot be the basis for an award of disability benefits under Title II ."  Eggering v. Astrue, No. 4:10CV821 TIA, 2011 WL 3904103 at *7 (E.D. Mo. Sept. 6, 2011).  "Evidence from outside the insured period can be used in helping to elucidate a medical condition during the time for which benefits might be rewarded."  Cox, at 907.  "When an individual is no longer insured for Title II disability purposes, [the court] will only

consider an individual's medical condition as of the date she was last insured." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).

The ALJ acknowledged that plaintiff testified he had lung cancer and rheumatoid arthritis, but stated that the onset of these impairments occurred after his date last insured. (Tr. 27). With regard to plaintiff's lung cancer, plaintiff submitted records to the ALJ and the Appeals Council that reveal he was diagnosed with lung cancer in 2010. (Attachment to Doc. No. 20). Plaintiff contends that a 2006 chest CT scan revealed the presence of lymph nodes, which were determined to be benign, but later developed into lung cancer. (Tr. 461). Plaintiff notes that he was also diagnosed with COPD during the relevant period.

The ALJ properly found plaintiff's COPD was a severe impairment during the relevant period. (Tr. 26). Plaintiff's lung cancer, however, was not diagnosed until 2010. Plaintiff's insured status expired on March 31, 2008. Consequently, the ALJ was not required to consider the medical evidence regarding plaintiff's lung cancer, which developed after his date last insured. Eggering, at *7.

With regard to plaintiff's rheumatoid arthritis, the ALJ noted that Dr. Ghosh diagnosed plaintiff with rheumatoid arthritis on March 18, 2008. (Tr. 29, 801). The ALJ, however, stated that in October 2007, plaintiff's rheumatoid factor was normal, and Dr. Ghosh offered no support for his opinion. (Tr. 30). The ALJ therefore rejected Dr. Ghosh's opinion. (Tr. 30).

The undersigned finds that the ALJ erred in rejecting Dr. Ghosh's diagnosis of rheumatoid arthritis. The record reveals that Dr. Ghosh first diagnosed plaintiff with rheumatoid arthritis on January 4, 2008, within the relevant period. (Tr. 799). Dr. Ghosh again diagnosed plaintiff with rheumatoid arthritis on March 18, 2008, as the ALJ acknowledged. (Tr. 801). The ALJ rejected

Dr. Ghosh's diagnosis of rheumatoid arthritis, noting that plaintiff's rheumatoid factor was normal in October 2007. (Tr. 30). Defendant argues that plaintiff's results "on a variety of tests" were normal and Dr. Ghosh's diagnosis of rheumatoid arthritis was based solely on plaintiff's subjective complaints. (Doc. No. 25, p. 7). The record belies defendant's claims.

First, there is no evidence that Dr. Ghosh's diagnosis was based solely on plaintiff's subjective complaints. Rather, Dr. Ghosh noted positive objective findings on examination. On January 4, 2008, Dr. Ghosh noted tenderness with trace swelling in the wrists, finger joints, ankles, toe joints, shoulders, and knees. (Tr. 799). On March 18, 2008, Dr. Ghosh noted tenderness with trace swelling in the wrists, elbows, hips, and shoulders. (Tr. 801).

Second, although the ALJ indicates that plaintiff's rheumatoid factor was normal in October 2007, the record does not contain such a finding. Further, even if plaintiff's rheumatoid factor was normal in October 2007, this is not inconsistent with a diagnosis of rheumatoid arthritis. See Mayo Clinic, Rheumatoid factor, http://www.mayoclinic.com/health/rheumatoid-factor/MY00241 (last visited July 15, 2013) ("High levels of rheumatoid factor in the blood are most often associated with autoimmune diseases, such as rheumatoid arthritis...But rheumatoid factor may be detected in some healthy people, and people with autoimmune diseases sometimes have normal levels of rheumatoid factor.").

Dr. Ghosh, a rheumatologist, is a specialist in rheumatoid arthritis. He had been treating plaintiff regularly for his pain complaints, including complaints of pain in his hands, knees, shoulders, and morning stiffness.[40] Dr. Ghosh's diagnosis is supported by the record, including

---

[40]Signs and symptoms of rheumatoid arthritis include tender, warm, swollen joints; and morning stiffness. Early rheumatoid arthritis tends to affect the joints that attach the fingers to the hands and the toes to the feet. As the disease progresses, symptoms often spread to the knees,

his own findings on examination. Dr. Ghosh diagnosed plaintiff with rheumatoid arthritis during the relevant period. Dr. Ghosh prescribed medication for plaintiff's rheumatoid arthritis, including Orencia infusions, during this period. Rather then accept Dr. Ghosh's diagnosis of rheumatoid arthritis, the ALJ substituted his own opinion and rejected Dr. Ghosh's diagnosis. This is "tantamount to the ALJ 'playing doctor,' a practice forbidden by law." Pates-Fires v. Astrue, 564 F.3d 935, 947 (8th Cir. 2009) (quoting Rohan v. Chater, 98 F.3d 966 (7th Cir. 1996)). Significantly, Dr. Ghosh completed an Arthritis Residual Functional Capacity Questionnaire, in which he expressed the opinion that plaintiff had significant limitations due in part to his rheumatoid arthritis. (Tr. 820-25).

Plaintiff's rheumatoid arthritis had more than a minimal effect on plaintiff's ability to work during the relevant period. Thus, the ALJ erred in failing to consider plaintiff's rheumatoid arthritis a severe impairment during the relevant period. See Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996) (sequential evaluation process may be terminated at step two only when impairment or combination of impairment would have no more than a minimal effect on claimant's ability to work). The ALJ's failure to consider plaintiff's rheumatoid arthritis affected the ALJ's analysis at all steps in the sequential analysis. Thus, the ALJ's decision finding plaintiff not disabled during the relevant period is not supported by substantial evidence.

## Conclusion

In sum, the ALJ erred in rejecting plaintiff's diagnosis of rheumatoid arthritis by Dr.

---

ankles, elbows, hips and shoulders. See Mayo Clinic, Rheumatoid arthritis, http://www.mayoclinic.com/health/rheumatoid-arthritis/DS00020 (last visited July 15, 2013).

Ghosh during the relevant period. For this reason, this cause will be reversed and remanded to the ALJ in order for the ALJ to consider plaintiff's rheumatoid arthritis as a severe impairment during the relevant period, re-evaluate the opinion of Dr. Ghosh, determine whether plaintiff's combination of impairments meets or equals a listed impairment, perform a proper credibility analysis, properly assess plaintiff's RFC, and determine whether plaintiff was capable of performing any work during the relevant period. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this 9th day of September, 2013.


LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE